BRIAN W. BOSCHEE, ESQ., Bar No. 7612
BBoschee@nevadafirm.com
KIMBERLY P. STEIN, ESQ. , Bar No. 8675
Nevada Bar No. 8675
E-mail:      kstein@nevadafirm.com
HOLLEY DRIGGS, WALCH FINE WRAY PUZEY & THOMPSON
400 South Fourth Street, Third Floor
Las Vegas, Nevada 89101
Telephone:   (702) 791-0308/Facsimile: (702) 791-1912

Robert I. Harwood, New York Bar Registration No. 4202826  *(PHV Application forthcoming)*
rharwood@hfesq.com
Daniella Quitt, New York Bar Registration No. 2246676  *(PHV Application forthcoming)*
dquitt@hfesq.com
488 Madison Avenue, 8th Floor
New York, NY 10022
Telephone: (212) 935-7400/Facsimile: (212) 753-3630

Ronen Sarraf, New York Bar Registration No. 3938040 *(PHV Application forthcoming)*
ronen@sarrafgentile.com
Joseph Gentile, New York Bar Registration No. 4232039 *(PHV Application forthcoming)*
joseph@sarrafgentile.com
SARRAF GENTILE LLP
14 Bond Street, Suite 212
Great Neck, NY 11021
Telephone: (516) 699-8890/Facsimile: (516) 699-8968
*Attorneys for Plaintiff*
*Rickey A. Broussard*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| RICKEY A. BROUSSARD, derivatively on behalf of Nominal Defendant Wynn Resorts, Limited, | CASE NO.: |
| Plaintiff, | **VERIFIED DERIVATIVE COMPLAINT** |
| vs. | JURY DEMAND |
| JOHN J. HAGENBUCH, RAY R. IRANI, JAY L. JOHNSON, ROBERT J. MILLER, PATRICIA MULROY, CLARK T. RANDT, JR., ALVIN A. SHOEMAKER, KIMMARIE SINATRA, J. EDWARD VIRTUE, D. BOONE WAYSON, and STEPHEN A. WYNN, | |
| Defendants, | |
| and | |
| WYNN RESORTS, LIMITED, a Nevada Corporation, | |
| Nominal Defendant. | |

Plaintiff Rickey A. Broussard, derivatively on behalf of Wynn Resorts, Limited ("Wynn Resorts" or the "Company"), alleges upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based upon a review of publicly available information, including Securities and Exchange Commission ("SEC") filings by Wynn Resorts, media reports about Wynn Resorts, and Court pleadings concerning Defendants, as follows:

## INTRODUCTION

1.    This is a shareholder derivative action brought by Plaintiff against certain the Company's directors and officers for breaches of fiduciary duties.  Wynn Resorts is a leading developer, owner, and operator of destination casino resorts.  It primarily operates in Las Vegas, Nevada, the largest gaming market in the United States, and in Macau, a special administrative region of the People's Republic of China and the largest gaming market in the world.

2.    During the relevant period defendant Stephen Wynn led the Company as its founder, Chief Executive Officer and Chairman of the Board of Directors (the "Board").  During this period, the Board and its General Counsel intentionally disregarded decades of misconduct by Mr. Wynn and continued  to endorse Mr. Wynn's leadership role at the Company and his lavish compensation package, while assuring shareholders that the Company's risk, compliance and governance controls were extensive and effective to detect, prevent and remedy such misconduct.  As reported in the financial media, even in the wake of the scandal, the Board "reluctantly" announced his resignation.  As a result of Defendants' conduct, the Company has suffered, and will continue to suffer, significant damage.  The Company will incur costs in connection with its business dealings, expansion projects, and the continued viability and licensure of its core gambling business.  The Company faces the prospect of selling itself or breaking itself up in a weakened state.  Further, the Company's goodwill and reputation have also been damaged.

3.    The Company remains under the  control  and/or  influence  of the primary wrongdoers who: (1) lack independence due to their interest in maintaining their positions and the substantial compensation and benefits they receive by virtue of those positions; and/or (2)

lack disinterestedness because they face a substantial likelihood of liability for their wrongful actions and inactions, as alleged herein.  As a result, any demand on the Board would be futile.

## JURISDICTION AND VENUE

4.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2).  Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interests and costs.  This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

5.     The Court has personal jurisdiction over each defendant because each defendant has committed acts related to the claims at issue in this Complaint within this District or has sufficient minimum contact with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

6.     Further, this Court has specific personal jurisdiction over each defendant pursuant to Nev. Rev. Stat. § 78.135(1), which (i) "provides notice to [corporate] officers and directors that they are subject to derivative suits for violation of their authority," (ii) "provides [them] the understanding that by violating their authority as a Nevada corporation's officer or director, they are subject to an action under Nevada's laws in Nevada," and (iii) "supports a district court's authority to exercise personal jurisdiction over officers and directors in such lawsuits." *See Consipio Holding, BV v. Carlberg*, 282 P.3d 751, 756 (Nev. 2012). Additionally, by purposefully engaging in acts that have caused direct harm to Wynn Resorts, a Nevada corporation, the Defendants have established contacts with Nevada and have "affirmatively direct[ed] conduct" toward Nevada. *Id.*

7.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because Nominal Defendant Wynn Resorts, is headquartered in this District and a number of the Individual Defendants are citizens of the State of Nevada.  Additionally, venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, occurred in this District.

/ / /

/ / /

- 3 -

**PARTIES**

**Plaintiff**

8.     Plaintiff Rickey A. Broussard, a resident of Texas, was a shareholder of Wynn Resorts at the time of the wrongdoing complained of, has continuously been a shareholder since at least September 2015, and is a current Company shareholder.

**Nominal Defendant**

9.     Nominal Defendant Wynn Resorts is a Nevada corporation with principal executive offices located at 3131 Las Vegas Boulevard South, Las Vegas, Nevada.  Wynn Resorts was formed in June 2002, and is a leading developer, owner, and operator of destination casino resorts.  Wynn Resorts owns and operates two destinations resorts: "Wynn Las Vegas," which includes "Encore at Wynn Las Vegas," and "Wynn Macau," which includes "Encore at Wynn Macau."  Wynn Resorts is the parent company of Wynn Macau which in turn owns Wynn Resorts (Macau) S.A. ("WRM"), the owner and operator of the Wynn Macau.  Wynn Resorts is named in this Complaint as a Nominal Defendant solely in a derivative capacity, and this shareholder derivative action is on its behalf.

**Defendants**

10.     Defendant John J. Hagenbuch ("Hagenbuch"), a resident of Idaho, has been a Company director since December 2012.  Hagenbuch is Chairman of the Audit Committee and a member of the Compensation Committee.

11.     Defendant Ray R. Irani ("Irani"), a resident of California, has been a Company director since October 2007.  Irani is a member of the Nominating and Corporate Governance Committee.

12.     Defendant Jay L. Johnson ("Johnson"), a resident of Idaho, has been a Company director since August 2016. Johnson is a member of the Compensation Committee.

13.     Defendant Robert J. Miller ("Miller"), a resident of Nevada, has been a Company director since October 2002.  Miller is the Company's Lead Independent Director, Chairman of the Nominating and Corporate Governance Committee, Chairman of the Company's Corporate

Compliance Committee, the Company's Compliance Director and a member of the Audit Committee.

14.   Defendant Patricia Mulroy ("Mulroy"), a resident of Nevada, has been a Company director since October 2015. Mulroy is a member of the Nominating and Corporate Governance Committee and the Corporate Compliance Committee. Mulroy served on the Nevada Gaming Commission from July 2014 through October 2015.

15.   Defendant Clark T. Randt Jr. ("Randt"), a resident of Utah, has been a Company director since October 2015.  In 2015, Randt entered into a $600,000 consulting agreement with the Company.

16.   Defendant Alvin V. Shoemaker ("Shoemaker"), a resident of Idaho, has been a Company director since December 2002.  Shoemaker is also a member of the Audit Committee and Compensation Committee.

17.   Defendant Kimmarie Sinatra ("Sinatra"), a resident of Nevada, has been the Company's Senior Vice President, General Counsel and Secretary since March 2006. Sinatra also serves as a director for Wynn Macau, Limited.

18.   Defendant J. Edward Virtue ("Virtue"), a resident of Florida, has been a Company director since November 2012.  Virtue is Chairman of the Compensation Committee and a member of the Nominating and Corporate Governance Committee.

19.   Defendant D. Boone Wayson ("Wayson"), a resident of Maryland, has been a Company director since 2003.  Wayson is also Chairman of Wynn Resorts' Audit Committee and has been since at least April 2011.  Wayson is also a member of the Nominating and Corporate Governance Committee.  On February 6, 2018, following Mr. Wynn's resignation as CEO and Chairman of the Board, the Board appointed Wayson as Chairman of the Board.

20.   Defendant Stephen Wynn, a resident of Nevada, was Wynn Resorts' Chairman of the Board and Chief Executive Officer ("CEO") until he was forced to resign.  Mr. Wynn holds approximately 11.8% of the Company's common stock. On February 6, 2018, Mr. Wynn announced his resignation as CEO and Chairman of the Board.

/ / /

21.   Defendants Hagenbuch, Irani, Johnson, Miller, Mulroy, Randt, Shoemaker, Virtue, Wayson are collectively referred to herein as the "Director Defendants."

22.   Defendants Wynn, Sinatra and the Director Defendants are collectively referred to herein as the "Individual Defendants."

## NEVADA GAMING REGULATIONS

23.   Wynn Resorts stock is traded on the NASDAQ  Exchange under the symbol "Wynn."

24.   In addition, because the Company is incorporated and headquartered in Nevada, it must comply with the gaming laws of the state, which prohibit "unsuitable" associations that "reflect or tend to reflect discredit [or disrepute] upon the State of Nevada or the gaming industry." NGC Regulation 5.011.  Nevada law imposes comprehensive regulatory requirements upon gaming licensees; including obligations that those associated with the licensee possess the necessary character, qualifications, and integrity to be suitable to hold that privilege so as to not pose a threat to the public interest or the integrity of the regulation and control of gaming.  In particular, the Nevada gaming regulations are as follows, in pertinent part:

> 5.011 Grounds for disciplinary action.  The board and the commission deem any activity on the part of any licensee, his agents or employees, that is inimical to the public health, safety, morals, good order and general welfare of the people of the State of Nevada, or that would reflect or tend to reflect discredit upon the State of Nevada or the gaming industry, to be an unsuitable method of operation and shall be grounds for disciplinary action by the board and the commission in accordance with the Nevada Gaming Control Act and the regulations of the board and the commission. Without limiting the generality of the foregoing, the following acts or omissions may be determined to be unsuitable methods of operation. . . .

> Failure to conduct gaming operations in accordance with proper standards of custom,  decorum and decency, or permit any type of conduct in the gaming establishment which reflects or tends to reflect on the repute of the State of Nevada and act as a detriment to the gaming industry.

## SUBSTANTIVE ALLEGATIONS

**Company Background**

25.   Defendant Stephen Wynn is a well-known Las Vegas casino operator.  Mr. Wynn developed Mirage Resorts, Inc., a casino conglomerate that owned Treasure Island, and transformed the Las Vegas Strip with the Mirage and Bellagio casinos.  On May 31, 2000, MGM

Grand Inc. merged with Mirage Resorts, Inc. ("Mirage").   In June 2000, after a boardroom battle, which centered on allegations that Mr. Wynn misappropriated company funds, MGM Grand, Inc. ousted Mr. Wynn as Chief Executive Officer of Mirage Resorts.

26.   Mr. Wynn then purchased the old Desert Inn casino and had plans to build a new casino on the site.  Mr. Wynn lacked the capital to fund the development of the casino and needed investors for the project.  Having recently been forced out of Mirage, Mr. Wynn was shunned by traditional sources of capital.  Mr. Wynn eventually called on Mr. Okada.  He and Okada formed a 50-50 partnership to build casinos in Las Vegas under Mr. Wynn's direction.

27.   Beginning in November 2000, Mr. Wynn used a Nevada limited liability company called Valvino Lamore, LLC ("Valvino") as the holding entity for his new Desert Inn casino project.  After discussions between Mr. Wynn and Mr. Okada, Aruze USA, Inc. ("Aruze") made a contribution of $260 million in cash to Valvino in exchange for 50% of the membership interests in Valvino, effective November 30, 2000.  This provided the capital for the development of what is now known as Wynn.  In April 2002, Aruze made two additional contributions totaling $120 million to Valvino.

28.   On September 28, 2002, Mr. Wynn contributed the interests in Valvino to Wynn Resorts.  Thereafter, on October 21, 2002, Mr. Okada became a member of the Board.

29.   On October 25, 2002, Wynn Resorts conducted an initial public offering (the "IPO") on NASDAQ at $13 per share.  At this time, Mr. Okada and Mr. Wynn each owned about 30% of the outstanding stock.  Shortly thereafter, Mr. Okada became Vice Chairman of the Wynn Resorts' Board.

30.   At a hearing before the Nevada State Gaming Control Board and Nevada Gaming Commission, on June 4, and 17, 2004, respectively, Mr. Wynn affirmed that "Mr. Okada was not only suitable" to receive a gaming license in the state of Nevada, "but he was desirable." Repeatedly referring to Mr. Okada as his "partner," Mr. Wynn said Mr. Okada was "dedicated to the pursuit of excellence."  In sworn testimony, Mr. Wynn also stated "I have never dreamed that there would be a man as supportive, as long-term thinking, as selfless in his investment as Mr. Okada."

31.   On April 28, 2005, Wynn Las Vegas opened.  On September 8, 2006, Wynn Resorts opened in Macau.  "Encore" hotels followed in both locations.

**The Board Ousts Okada**

32.   In March 2009, Mr. Wynn and his wife Elaine Wynn divorced.  In connection with the terms of the divorce settlement, Mr. Wynn was forced to split his shares with Elaine Wynn, which made Mr. Okada, through Aruze, Wynn Resorts' largest stockholder, holding 24,549,222 shares of Wynn Resorts, or 19.66% of the outstanding stock.

33.   Mr. Wynn, no longer the largest stockholder saw Mr. Okada as a potential threat.

34.   In October or November 2011, Okada began demanding to investigate the Company's business records related to payments to the University of Macau Development Foundation (the "Foundation") and the propriety of such payments.  The Board refused Mr. Okada's demands and sought to discredit Mr. Okada.

35.   At a November 1, 2011 Board meeting, defendant Miller presented a report of an alleged investigation by the Corporate Compliance Committee into Mr. Okada's and Universal Entertainment Corp.'s ("Universal") activities in the Philippines.  The report disclosed that the Corporate Compliance Committee had allegedly conducted one internal and two "independent" investigations into allegations of suitability, conflicts of interest, and possible breaches of fiduciary duties related to the acquisition of land for a Philippine casino project and charitable contributions made by Universal.  According to a Counterclaim in a suit brought by Wynn Resorts against the Okada entities (2:12-cv-00400 D. Nev. March 12, 2012)(Docket No. 5)(the "Counterclaim"), the contents of these purported investigations were not presented to Mr. Okada. The Board, without debate, deliberation, or allowing Mr. Okada a chance to respond, summarily eliminated Mr. Okada's position as Vice-Chairman of the Board.  The Board did not disclose this fact until February 19, 2012.

36.   Also on November 1, 2011, the Board ratified the retention of Freeh Sporkin & Sullivan LLP to investigate Mr. Okada.  This was also not disclosed until February 22, 2012, when the investigation was complete.

/ / /

37.   On January 11, 2012, Mr. Okada filed a Petition against the Company demanding, among other things, to inspect the Company's books and records related to the Macau donation. Over the objection of the Company, at a hearing held on February 9, 2012, the Nevada State Court ruled that Mr. Okada has the right to "reasonable" access to internal Company documents. *See Okada v. Wynn Resorts, Ltd.*, No. A-12-654522-B, Dep't XI (Nev. Dist. Ct.).  Among other things, Mr. Okada's Petition questions the propriety of Wynn Resort's donations to the Foundation.

38.   Mr. Okada was not alone in his suspicions of the donations to the Foundation and related matters.  On February 8, 2012, Wynn Resorts received a letter from the SEC stating that the Division of Enforcement of the SEC had commenced an "informal inquiry" regarding matters in Macau and requesting that the Company preserve information relating to the donation to the Foundation and any other charitable organizations.   It also requested the preservation of information related to the Company's Macau gaming licenses.

39.   On February 15, 2012, Wynn Resorts noticed a special meeting of the Board in Las Vegas.  Mr. Okada was in Japan.  Apparently, there were technical difficulties when Mr. Okada tried to participate in the call.  The Board voted to find Mr. Okada as "unsuitable" and forced the redemption of his shares.

40.   The Board then caused the Company to file a complaint in the District Court of Clark County, Nevada (No. A-12-656710-B) against Okada, Aruze, and Universal, alleging breaches of fiduciary duty and related claims. This lawsuit has taken on a life of its own and is scheduled for trial in the Spring of 2018.  Among other things, Okada and his related entities have asserted counterclaims and have alleged that the market value of the shares was $2.7 billion not the $1.9 billion he received in a note.

41.   In a press release dated February 19, 2012, announcing the "redemption" of Mr. Okada's shares, the Board stated that the redemption was based on a finding of "unsuitability" and was necessary "to protect the Company's gaming licenses." However, since the share redemption converted Mr. Okada from Wynn Resorts' largest equity holder to its largest debt holder, the actions taken by the Board did protect the Company from the alleged "unsuitability"

of Mr. Okada.  The Gaming Commission still had the right to investigate a licensee who has an affiliation with either an unsuitable stockholder or debtholder.  Nev. Rev. Stat. Ann. § 463.643(7) (any "unsuitable" person "shall not hold directly or indirectly" a "voting security" or a "debt security").  The redemption thus had no legitimate business purpose and came at great expense to Wynn Resorts.

**Stephen Wynn's Egregious Personal Misconduct**

42.  On January 26, 2018, *the Wall Street Journal* (the "WSJ") reported accounts by several former employees of sexual misconduct by Mr. Wynn going back several years. The WSJ spoke with numerous current and former employees of Mr. Wynn who indicated concern about their future employment given Mr. Wynn's dominant role in the casino industry.

43.  The WSJ story was based on dozens of interviews with people who worked at Wynn Resorts casinos and who described a pattern of sexual misconduct. They told of "behavior that cumulatively would amount to a decades-long pattern of sexual misconduct" by Mr. Wynn. Some accounts described Mr. Wynn as pressuring employees to perform sex acts.  Former employees said that given Mr. Wynn's prominence and power, they felt intimidated in Mr. Wynn's presence and admitted to entering fake appointments to help others avoid being in Mr. Wynn's presence alone.  They recounted stories of female employees, upon hearing of Mr. Wynn's arrival, hiding in bathrooms or back rooms. "Everybody was petrified," said Jorgen Nielsen, a former artistic director, who added that he and others repeatedly informed senior Company executives of Mr. Wynn's sexual advances, but "nobody was there to help us."

44.  A former massage therapist at the Wynn Las Vegas spa said that Mr. Wynn booked several appointments a week with her in his office suite, continually adjusting a towel to expose himself and ultimately demanding its removal.  The former employee said that Mr. Wynn later asked her to perform oral sex on him which she refused.

45.  Other former employees also said that Mr. Wynn often wore revealing clothes, exposing his genitals.  Former employees have also said that Mr. Wynn asked to kiss them and would describe things he wanted to do them sexually.

/ / /

46.   The WSJ also cited evidence of harassment by Mr. Wynn at his former companies. For example, Dennis Gomes, an executive at the Golden Nugget in Las Vegas when Mr. Wynn was running it, said that he routinely received complaints from department heads of Mr. Wynn's chronic sexual harassment.  In a 1990s suit involving Mr. Gomes's departure to work for a Trump casino, Mr. Gomes described what he called a "disgraceful pattern of personal and professional conduct" that he said included Mr. Wynn's directing him to get the home phone numbers of casino cocktail waitresses.   Mr. Gomes died in 2012. His widow, Barbara Gomes, when interviewed by the WSJ, said "I remember him saying, 'I'm not his pimp,'" referring to Mr. Wynn.

47.   The WSJ also reported that in 2005 a manicurist was forced by Mr. Wynn to have sex with him, despite her protests.  She later filed a detailed report with the Company's human resources department describing what had occurred.  In response to the report filed with human resources, the employee's department manager got a telephone call from a Company executive, Doreen Whennen, criticizing her for submitting the report to the human resources department rather than bringing the matter directly to her.  According to the WSJ, no one followed up on the matter.  The manicurist was paid a $7.5 million settlement which the *Las Vegas Review-Journal* reported as involving a paternity claim.  The settlement was supposedly paid from Mr. Wynn's personal funds and kept secret so that it would not disturb the upcoming opening of the Wynn Las Vegas and Wynn Macau. According to the *Las Vegas Review-Journal*, Ms. Wynn learned of the incident in 2009 while preparing for her divorce and spoke with Company officials who knew of the allegations. The WSJ stated that Ms. Wynn raised the matter internally; a CNBC article also reported that Ms. Wynn brought the matter to the attention of the Board, of which she was a member at the time.  Neither she nor any of the other Board members did anything in response.

48.   These allegations are referenced in Ms. Wynn's lawsuit seeking to remove the restrictions on the sale of her Company stock that she received in connection with her divorce from Mr. Wynn.  In early February 2018, Mr. Wynn agreed to give up his control over her shares but failed to end the Court battle. Ms. Wynn's allegations reference a "multimillion dollar

payment" made by Mr. Wynn due to "serious misconduct" against a Company employee on Company property.  An amended pleading in the litigation alleges that defendant Sinatra knew about the settlement as well.  Ms. Wynn's attorneys have said that in making the settlement in 2005 without telling the Board, Mr. Wynn recklessly exposed the Company and other directors to liability.  At least two members of the Board knew of the settlement in 2009, and by 2015 the Board was on notice of the settlement and failed to take action. The Individual Defendants' failure to act or investigate allegations of such egregious misconduct involving Company employees represents an intentional violation of their fiduciary duties to the Company.

**The Board Learns of Mr. Wynn's Egregious Misconduct and Intentionally Ignores It**

49.   Mr. Wynn's sexual harassment of Company employees was pervasive and well known.  As discussed above, the Board knew of Mr. Wynn's misconduct through Elaine Wynn, in 2009.  This misconduct was also referenced in Elaine Wynn's lawsuit which the Board cited in removing Mrs. Wynn from the Board.  According to Company counsel, the Company intentionally withheld disclosure to Massachusetts gaming regulations of the $7.5 million settlement while the licensing process was ongoing for the Wynn Boston Harbor. The Board thus knowingly ignored these allegations of misconduct, took no action to investigate them, and actively withheld their disclosure to gambling regulators.

50.   Mr. Wynn's employment agreement with the Company has been amended seven times since initially entered into in 2002.  These amendments have resulted in an agreement that extends until 2022, entitles Mr. Wynn to an annual base salary of $2.5 million and entitles Mr. Wynn to use the Company's plane without needing to reimburse the Company.  If Mr. Wynn is terminated for losing a license with a gaming authority, the Company would have to pay Mr. Wynn about $110 million.

51.   Following the WSJ revelations, the Board stated that it was "deeply committed to ensuring the safety and well-being" of its employees and reportedly formed a Special Committee, chaired by defendant Mulroy and joined by defendants Hagenbuch and Johnson. The creation of the Special Committee, only after the WSJ publicly revealed the misconduct, confirms that the

Board had previously not investigated those allegations. The Special Committee originally hired O'Melveny & Myers LLP and on February 12, 2018 hired Gibson Dunn & Crutcher LLP to replace them.  On February 2, 2018, a telephonic and internet-based reporting system was set up for current and former Wynn employees to provide information to the Board relevant to its investigation.

**The Board Concealed Mr. Wynn's Misconduct
From Shareholders and Regulators**

52.   The Board has repeatedly assured shareholders that they and the Company's management were "committed to sound and effective corporate governance."  *See* Wynn Resorts' 2017 Proxy Statement (the "2017 Proxy").  The Board has touted that the "Company has established a comprehensive corporate governance framework, with policies and programs designed not only to satisfy the extensive regulatory requirements applicable" to the Company's business but also to build shareholder value.

53.   The Board has referred to its extensive industry and regulatory experience to support its representation to shareholders that the Company had a comprehensive corporate governance and risk compliance programs to protect the Company. The biographies for defendants Miller and Mulroy specifically highlight their experience with the Nevada Gaming Commission as reasons for their continued positions on the Board.

54.   The 2017 Proxy's Compensation Discussion and Analysis, highlights the Company's recent expansion efforts as a basis for the lavish compensation and benefits awarded to Mr. Wynn and the Individual Defendants.  According to the 2017 Proxy, the Compensation Committee viewed 2016 favorably in part due to the recent opening of the Wynn Palace in Macau (generating over $100 million in its first few months of operation) and the commencement of construction activities on the Wynn Boston Harbor, which is scheduled to open in mid-2019. However, these accomplishments came at a cost of $1.23 billion in capital expenditures.  By concealing Mr. Wynn's misconduct and failing to have sufficient governance controls in place to investigate those allegations of misconduct, the Board has placed those projects in jeopardy in light of future gaming license rejections.

55.   The Board knowingly withheld from shareholders the fact that the Company's future expansion and revenue was in serious jeopardy by Mr. Wynn's misconduct and the Board's failure to address or disclose that conduct to the licensing and gaming regulators. This is particularly egregious here since, according to the Company's own public filings, under the Section "Risk Related to our Business," the loss of services of Mr. Wynn would "significantly" impair the business. *See, e.g.*, 2016 Form 10-K at 16.

**The Board's Fiduciary Breaches
Have Harmed the Company**

56.   Following the public disclosure of Mr. Wynn's misconduct, the price of Company stock fell 10% on January 26, 2018, the day the WSJ article was published.  On the following Monday, shares fell an additional 9.3%.

57.   On January 30, 2018, Standard Poor's Global Rating revised its outlook for the Company from "stable" to "negative."   The ratings downgrade reflected the "Significant uncertainty" over the resolution of the various investigations into Mr. Wynn's misconduct.  The ratings agency further stated that the misconduct allegations "could impair the Company's brand and ability to maintain or review its gaming licenses."

58.   A J.P. Morgan analyst report projected shares could drop to around the $150 level before the fallout is over. "Steve's name is on each one of his resorts in Las Vegas and Macau and therefore they are potentially susceptible to downward swings in patronage," according to the report.  "Such allegations (in the Journal article) can't be helpful to Wynn in competitive integrated resort license and development globally, such as in Japan, or in gaming license renewals in Macau and Nevada."

59.   The WSJ article has triggered investigating by gaming regulators in Nevada, Massachusetts and Macau.

60.   On January 30, 2018, the Nevada gambling regulators opened a formal investigation into misconduct. According to AG Burnett, former chairman of the Nevada Gaming Control Board, the state's main regulatory body: "Nevada regulators have a broad range

of options when it comes to potential disciplining of a licensee." These include "things like complaints, fines, and even potentially revocation."

61. Regulators in Massachusetts, where the Company is building a $2.4 billion property, are also investigating the allegations. On January 31, 2018, Massachusetts gambling commissioners met to discuss the allegations against Mr. Wynn. The Company was granted a license based on a 2011 state law which required the gambling commission to consider the "integrity, honesty, good character and reputation of the applicant" when considering bids for a gambling license. The law also notes that licensees "shall have a continuing duty to maintain their integrity and financial stability." Elaine Driscoll, a state gambling-commission spokeswoman, said the 2005 settlement and the alleged sexual misconduct weren't reported by the Company in its application for the license, awarded in September 2014. The *Las Vegas Review-Journal* reported that lawyers from the Company confirmed that the $7.5 million settlement "was not disclosed to investigators on advice of counsel." This admission demonstrates that the Company, including Ms. Sinatra, knew of the allegations against Mr. Wynn and intentionally concealed it from Massachusetts regulators. The Company's 15-year license to operate the only eastern Massachusetts resort casino is now jeopardized. Ms. Driscoll said the gambling commission opens a review if it becomes aware through media reports, other regulators or other sources "that a licensee or qualifier's suitability should be reviewed." Massachusetts Governor Charlie Baker has said that the allegations of misconduct by Mr. Wynn are "appalling and disgraceful," and that, if true, he doesn't believe the Company meets the state regulator's suitability standard. According to J.P. Morgan, the Massachusetts project was expected to open in 2019 and generate $252 million in earnings, equal to about 9% of Company's world-wide earnings.

62. The government of Macau, through its Gaming Inspection and Coordination Bureau ("DICJ"), has met with local Company representatives and issued a statement stressing the importance of major shareholders, directors and key employees of casino operators meeting suitable qualifications. The Wynn Macau represents more than 70% of the Company's overall business.

63. On January 27, 2018, Mr. Wynn resigned as finance chairman for the Republican National Committee. The Republican Governors Association has said it will return the $100,000 in donations it received over the past three years from the Company. On February 1, 2018, the University of Pennsylvania revoked Mr. Wynn's honorary degree and removed his name from a campus plaza and scholarship. On or about February 6, 2018, the Board "reluctantly" announced that it had "with a collective heavy heart" accepted Mr. Wynn's resignation. The Board appointed Matt Maddox as CEO and defendant Wayson as Chairman of the Board.

## DEFENDANTS' FIDUCIARY OBLIGATIONS

**Fiduciary Duties**

64. By reason of their positions as officers, directors, and/or fiduciaries of Wynn Resorts, and because of their ability to control the business and corporate affairs of Wynn Resorts, the Individual Defendants owed and owe Wynn Resorts and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Wynn Resorts in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Wynn Resorts and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

65. Each officer and director of the Company owes Wynn Resorts and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations and management so that the market price of the Company's stock would be based on truthful and accurate information.

**Additional Duties of the Individual Defendants under the Code**

66. In addition to these duties, under the Company's Code of Business Conduct and Ethics (the "Code"), the Individual Defendants owed specific duties to Wynn Resorts that go above and beyond their fiduciary duties imposed by law. Indeed, the Code is "to reinforce and

enhance the Company's commitment to an ethical way of doing business." The Code applies to all employees, officers, and directors. The Code also requires the Individual Defendants to, among other things, comply with laws and regulations, avoid conflicts of interests, avoid taking corporate opportunities, and not offer gifts or other goods or monies in exchange for favoring the Company's business.

**Additional Duties of the Corporate Compliance Committee Defendants**

67.   In addition to these duties, the Company's Compliance Committee owed specific duties to the Company that go above and beyond their fiduciary duties imposed by law. The Corporate Compliance Committee is comprised of defendants Miller and Mulroy. The purpose of this committee is to assist the Company in maintaining the highest level of regulatory compliance, including, among other things, overseeing the administration of the Company's Gaming Compliance Program. The Gaming Compliance Committee's purpose is to assist the Company in maintaining the highest level of regulatory compliance.

**Control, Access, and Authority**

68.   The Individual Defendants, because of their positions of control and authority as officers and/or directors of Wynn Resorts, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

69.   Because of their advisory, executive, managerial, and directorial positions with Wynn Resorts, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and growth prospects of Wynn Resorts.

70.   At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Wynn Resorts, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

71.   To discharge their duties, the officers and directors of Wynn Resorts were required to exercise reasonable and prudent supervision over the management, policies, practices, and

controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Wynn Resorts were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations;

(b)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(c)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(d)    remain informed as to how Wynn Resorts conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws.

72.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed the Company and its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Wynn Resorts, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company have been ratified by the remaining Individual Defendants who collectively comprise the Board.

73.    The Individual Defendants breached their duty of loyalty and good faith and threatened the Company's gaming licenses.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

74.   Plaintiff brings this action derivatively in the right and for the benefit of Wynn Resorts to redress injuries suffered, and to be suffered, by Wynn Resorts as a direct result of breach of fiduciary duties, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.   Wynn Resorts is named as a Nominal Defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

75.   Plaintiff will adequately and fairly represent the interests of Wynn Resorts in enforcing and prosecuting its rights.

76.   Plaintiff was a shareholder of Wynn Resorts at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Wynn Resorts shareholder.

77.   The current Board consists of the following nine Director Defendants: Hagenbuch, Irani, Johnson, Miller, Mulroy, Randt, Shoemaker, Virtue, and Wayson.   Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act.

**Demand is Futile Because the Director**
**Defendants Lack Independence and/or Are**
**Controlled by and Beholden to Stephen Wynn**

78.   The principal professional occupation of Stephen Wynn until very recently was his employment with Wynn Resorts, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits.   As set forth herein, the Director Defendants were aware of the wrongs alleged herein and failed to act.   These Director Defendants are inherently conflicted and were selected by Mr. Wynn and have shown their loyalty by following Mr. Wynn's direction throughout their tenure on the Board.   The two directors that failed to comply with Mr. Wynn's directions – Mr. Okada and Mrs. Wynn – were removed from the Board.

/ / /

/ / /

79.   In addition, a decision that threatens the Company's very survival cannot be considered a valid exercise of business judgment and constitutes a breach of the duty of care.

80.   As a former Board member explains, "Mr. Wynn, has run Wynn Resorts as a personal fiefdom, packing the Board with friends who do his personal bidding, and paying key executive exorbitant amounts for their unwavering fealty."   Similarly, in a court filing in May 2017, Elaine Wynn said, "The Wynn Board may be the most compliant board of any major public company… In only three instances in the history of the Company has a director voted against Mr. Wynn's position on any issue."

81.   Mr. Wynn's domination over the Board is evidenced by, among other things, a longstanding voting agreement dating back to April 2002 that ensures that a majority of the Board would be comprised of candidates specifically chosen by him.   On January 6, 2010, the parties agreed "to vote all Shares held by them . . . in a manner so as to elect to Wynn's Board of Directors each of the nominees contained on each and every slate of directors endorsed by SAW [Stephen A. Wynn]."   The direct effect of this agreement has been that no person can serve on the Board unless they are chosen by Mr. Wynn, even though the Board's Nominating and Corporate Governance Committee purportedly is charged with choosing candidates for the Board.

82.   The Board is staggered, meaning a minority of Board members come up for re-election each year, insulating it from being replaced at any one given time.   Of the nine Director Defendants, four have sat on the Board for more than 10 years.   As discussed herein, the Board has also been charged as being weak, beholden to and overpaying Mr. Wynn.   In 2013, *the New York Times* reported that Mr. Wynn had received more than a million dollars' worth of personal travel in 2012 on the Company's private jet.

83.   In 2015 and 2016, Institutional Shareholder Services,  Inc.  ("ISS") recommended withholding votes to re-elect the Board's Compensation Committee.   ISS characterized Mr. Wynn's outsized pay package severance agreement of $330 million as beyond "the upper parameter of acceptable amounts."   In 2017, ISS gave Wynn Resorts its worst ranking for governance risk.

84.   Glass Lewis & Co, another advisory firm, also recommended that shareholders vote against the Company's compensation package, citing "poor overall design" and "performance disconnect." Glass Lewis gave the Company an "F" for its pay-for-performance practices for the last two years.

85.   The Company's poor governance practices have also been criticized by large investors such as BlackRock Inc., which owns nearly 5% of the Company's stock.  In 2017, BlackRock voted against the Company's pay package and opposed the reelection of certain directors. Vanguard, owner of 8% of the Company's stock, has also voted against the Company's pay practices and the reelection of certain directors, including defendant Miller, who is also chairman of the Board's corporate-governance committee.

86.   In February 2018 a Nevada court allowed claims against certain members of the Board based on their 2012 decision to remove Mr. Okada from the Board and redeem his shares to go forward. *Wynn Resorts v. Okada,* A-12-656710-B, Clark County District Court, Nevada (Las Vegas).  The feud between Mr. Wynn and Mr. Okada has been ongoing since 2012 and Mr. Okada has presented evidence that several directors intended to oust him from the Company months before an investigation into Okada's alleged misconduct was concluded. Defendants Irani, Miller, Sinatra, Wayson , and Wynn are all Plaintiff-Counter-Defendants in the suit.

87.   A majority of the Board lacks independence from Mr. Wynn due to numerous interrelated business, professional, and personal relationships that will prevent and have previously prevented the Director Defendants from taking the necessary and proper action on behalf of Wynn Resorts.  Stephen Wynn's long-term relationships with certain of the Director Defendants demonstrates his ability to use his power and wealth to control them.

88.   Defendant Hagenbuch lacks independence to consider a pre-suit demand because he was hand-picked by Mr. Wynn.  Hagenbuch has served on the Board since December 2012. In 2016, Hagenbuch received over $400,000 in compensation from the Company.

89.   In the April 2015 proxy fights, Mr. Wynn supported Hagenbuch for reelection over his ex-wife Elaine Wynn.  Hagenbuch was reelected over Elaine Wynn, who lost her seat on the Board.

90.   Defendant Irani lacks independence to consider a pre-suit demand because he was also hand-picked by Mr. Wynn.  Irani has served on the Board since October 2007 and was on the Board at the time Ms. Wynn brought the settlement of the paternity suit to the Board's representative in 2009.   In 2016, Irani received over $360,000 in compensation from the Company.

91.   During his Board membership, Irani also served as a director of TCW Group, Inc., a subsidiary of SocieteGenerale, a company that was instrumental in arranging and providing funding to the Company for its Macau properties. For example, SocieteGenerale served as the lead banker for Wynn Macau's $1.55 billion financing in June, 2007. In March 1987, defendant Irani joined the board of directors for the parent company of Mr. Wynn's resort-casinos and served until that company was bought out in May 2000.

92.   Defendant Johnson lacks independence to consider a pre-suit demand because he also was hand-picked by Mr. Wynn.  Johnson has served on the Board since August 2016. In 2016, Johnson received over $380,000 in compensation from the Company.

93.   Defendant Miller lacks independence to consider a pre-suit demand because he was hand-picked by Mr. Wynn. Defendant Miller has served on the Board since 2002 and was on the Board when Ms. Wynn brought the settlement of the paternity lawsuit to the Board's representative's attention. In 2016, Miller received over $517,000 in compensation from the Company.

94.   Defendant Miller also has a longstanding relationship with Mr. Wynn that strongly supports the inference that Stephen Wynn has the ability to control defendant Miller.  In 1997 Miller testified at a libel trial Mr. Wynn had brought against the author of an unauthorized biography that he was "a 23 year old friend of Wynn's."  Mr. Miller and Mr. Wynn have been friends for over 40 years.

95.   Miller was aided by Mr. Wynn in the 1994 Nevada gubernatorial election. Defendant Miller's primary challenger in that race, Las Vegas Mayor Jan Laverty Jones, said that in 1993 Mr. Wynn "tried to discourage her" from challenging Miller.  Ms. Jones lost to

defendant Miller by a wide margin.   Mr. Wynn alone donated $70,000, avoiding a state law limiting corporate gifts to $20,000, by spreading his donations across four subsidiaries.

96.   From November 2004 to September 2012, Miller had a stake in Nevada Rose, LLC, the parent company to a group of entities engaged in the sale of rose nectar. Products sold by Nevada Rose LLC are used at the Company giving Miller a material financial interest in the business relationship between Nevada Rose and the Company.

97.   From 2000 to 2012, Miller has also been a director of International Gaming Technology ("IGT"), a Las Vegas entity in the business of designing, developing, manufacturing and marketing casino games, gaming equipment and systems technology for social gaming and wagering markets. The Company and IGT have a long and ongoing business relationship. In 2005, IGT machines populated roughly 70% of the Wynn Las Vegas gaming floor. More recently, Mr. Wynn interjected himself into an IGT proxy fight to defend Charles Mathewson, IGT's former chief executive officer. On February 23, 2013, Mr. Wynn issued a statement that he has "known Mathewson as a businessman and friend for over 30 years." Mr. Wynn said that Wynn casinos bought machines from IGT during the years in which Mathewson was leading IGT, the same period in which Miller was a director. IGT expanded into the Macau gaming market around the same time the Company expanded into that very same market. In November 2005, Wynn Macau reported running an IGT casino system: Wynn Macau had "chosen MICros opera Enterprise as its hotel solution with OPERA Property Management and OPERA Gaming Integration to its casino system." Given Miller's direct investment in Wynn Macau through IGT, and given that IGT provided the casino system for Wynn Macau, Miller has a financial interest and conflicting fiduciary duties in decisions exposing Mr. Wynn to personal liability and sanctions.

98.   Defendant Mulroy lacks independence to consider a pre-suit demand because she was hand-picked by Mr. Wynn to serve on the Company's Board.   Mulroy has served on the Board since October 2015.   In 2016, Mulroy received over $372,000 in compensation from the Company.   Prior to her service on the Board, Mulroy served at the Southern Nevada Water Authority where in 2013, according to ProPublica, she earned $353,000 a year plus benefits.

During her service at the water authority, Mulroy served the interests of Las Vegas developers and Mr. Wynn in particular. For example, early in her service at the water authority, amid historic drought, Mulroy placed a moratorium on new water commitments in Las Vegas, stopping the city's meteoric growth and putting projects that had not yet been approved – including the construction of new casinos – on hold. Within a day or two, Mr. Wynn summoned her. According to Mulroy: "He wanted to know what the hell was going on." Soon enough, Mulroy capitulated, lifted the moratorium and never issued another. Wynn quickly got what he wanted and Mulroy got to keep her job. As Mulroy later admitted: "Had we not done it, they would have found someone who would." Mulroy was beholden to Mr. Wynn while serving at the water authority and continues to remain beholden to him now.

99. Defendant Randt lacks independence. The Company's proxy statement, filed March 10, 2017, acknowledges that defendant Randt is not an independent director because he does do not meet the independence criteria of the NASDAQ listing standards. Director independence under NASDAQ and under Nevada demand futility law is virtually identical. Therefore, the Company has conceded that demand is futile as to defendant Randt.

100. Defendant Shoemaker lacks independence to consider a pre-suit demand because he was hand-picked by Mr. Wynn. Shoemaker has served on the Board since 2002. In 2016, Shoemaker received over $384,000 in compensation from the Company.

101. Shoemaker and Mr. Wynn also have a long-standing relationship. From 1986 to 1994, Shoemaker served with Mr. Wynn on the University of Pennsylvania Board of Trustees. Shoemaker was Chair of the University of Pennsylvania Board of Trustees when Mr. Wynn was appointed to the Board in June 1994. Both Mr. Wynn and defendant Shoemaker are graduates of the University of Pennsylvania. From 2009 until at least February 10, 2013, Shoemaker served as Honorary Counsel for the Sun Valley Summer Symphony, to which Mr. Wynn contributed $50,000.

102. Defendant Virtue lacks independence to consider a pre-suit demand because he was hand-picked by Mr. Wynn. Virtue has served on the Board since 2012. In 2016, Virtue received over $384,000 in compensation from the Company.

103.  Virtue was nominated to the Board on September 20, 2012, following Mr. Wynn's recommendation to the Nominating Committee.  Moreover, in the April 2015 proxy fights, Mr. Wynn supported Virtue for reelection over his ex-wife Elaine Wynn.  Virtue was ultimately reelected over Elaine Wynn, who lost her seat on the Board.

104.  Virtue has a long-standing financial relationship with Mr. Wynn.  Virtue had been head of Corporate Investments at Deutsche Bank from 1999 to February 2003. During that period, the Company received financing from Deutsche Bank and its affiliates. Also during that time, Deutsche Bank Trust Company Americas, an affiliate of Deutsche Bank Securities, Inc. was the administrative agent under a $1.05 billion credit facility entered into by Wynn Las Vegas, LLC and certain of its subsidiaries on October 20, 2001.

105.  In February 2003, Virtue led a management buyout of 80% of DB Capital, Deutsche Bank's private equity arm, and formed MidOcean Partners. Deutsche Bank retained a 20% interest in MidOcean Partners. Despite the separation, Virtue remained connected to Deutsch Bank through various business transactions. Those transactions included Mr. Wynn and Elaine Wynn. Mr. Wynn and Elaine Wynn invested in MidOcean Partners with Virtue. Deutsche Bank, which retained a 20% interest in MidOcean Partners, had substantial dealings with the Company. One of the conditions of Virtue joining the Board was for Company insiders to close certain accounts at MidOcean which generated fees for Virtue. Upon joining the Board, however, Virtue was granted options for 10,000 Company shares with a value of over $1 million.

106.  Defendant Wayson lacks independence to consider a pre-suit demand because he was hand-picked by Mr. Wynn.  Wayson has served on the Board since 2003.  In 2016, Wayson received over $384,000 in compensation from the Company.

107.  Mr. Wynn and Wayson's ties stretch back their entire life. In the 1950s, their fathers operated a bingo hall together in Wayson's Corner, Maryland.  Wayson's brother and sister, Edward O. Wayson, Jr. and Sarah Wayson, worked with Mr. Wynn: Edward served as Mr. Wynn's legal advisor and Sarah worked as a spokesperson for Mr. Wynn.  Wayson has worked at Wynn-controlled entities for several decades, earning substantial compensation and benefits. From December 1984 to February 1987, Wayson served as the President and CEO of the Golden

Nugget in Atlantic City, New Jersey, and was a director of Mirage Resorts, Inc. (the Golden Nugget's parent entity) from 1987 to 2000. During this period Mr. Wynn was head of Mirage Resorts. Wayson worked with Mr. Wynn at Mirage Resorts even appearances seemed that Mr. Wynn was "running Mirage Resorts . . . as if it were his private empire."[1]

108. The Company's proxy statement, filed March 10, 2017, acknowledges that defendant Wynn is not an independent director because he does do not meet the independence criteria of the NASDAQ listing standards. Director independence under NASDAQ and under Nevada demand futility law is virtually identical.

**The Director Defendants Face a Substantial Likelihood of Liability**

109. The Director Defendants also face a substantial likelihood of liability for failing to implement sufficient internal controls to detect, deter, and prevent the improper conduct at issue described in this action.

110. As a result of the Director Defendants' bad faith and intentional misconduct, as described herein, a majority of the Board knowingly and intentionally breached their fiduciary duties to the Company and did not exercise good faith proper business judgment to protect the best interests of the Company. By knowingly and intentionally disregarding, failing to investigate and concealing the allegations of egregious misconduct by Mr. Wynn, the Director Defendants face a substantial likelihood of personal liability for knowing and intentional breaches of duty and are therefore unable to independently investigate or prosecute the claims alleged herein on behalf of the Company.

111. Defendants knowingly and intentionally violated their fiduciary duties by, among other things, knowingly and intentionally failing to act in the face and with knowledge of credible allegations of egregious misconduct by the Mr. Wynn. The Board's knowing and intentional misconduct constituted knowing and intentional fiduciary misconduct and violation of law for which Defendants have personal non-exculpated liability under Nevada law.

---

[1]  Nina Munk, *Steve Wynn's Biggest Gamble*, Vanity Fair, June 2005.

112. Moreover, despite the Director Defendants having knowledge of the claims and causes of action raised by Plaintiff, the Board has failed and refused to seek to recover for Wynn Resorts for any of the wrongdoing alleged by Plaintiff herein.

## FIRST CLAIM FOR RELIEF
### Breach of Fiduciary Duty
(Against the Individual Defendants)

113. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

114. Defendants each owe Wynn Resorts and its shareholders the highest fiduciary duties of loyalty, good faith, fair dealing, and due care in managing and administering the Company's affairs.

115. Defendants have a duty to the Company and its shareholders to establish and maintain adequate internal controls to ensure the Company was operated in a prudent and lawful manner.  Defendants have an affirmative obligation to install an internal control system to uncover wrongdoing.  Moreover, Defendants have an obligation to ensure that, at all times, the Company, its officers and directors act in compliance with the law as detailed herein.  Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.

116. As a direct and proximate result of Defendants' acts and omissions, Wynn Resorts has been damaged in an amount in excess of Seventy-Five Thousand Dollars ($75,000). Wynn Resorts has also suffered injury to its corporate image and goodwill.

117. Defendants, and each of them, acted with fraud, oppression, and/or malice toward the Company, exhibited an intention and willingness to injure the Company and/or a conscious disregard for the rights and safety of the Company, and each Defendant, should be punished and made an example of by imposition of punitive or exemplary damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

118. As a result of the misconduct alleged herein, Defendants are liable to the Company, and their continuing violations of duty should be enjoined.

119. Plaintiff and the Company have no adequate remedy at law.

/ / /

**SECOND CLAIM FOR RELIEF**
**Unjust Enrichment**
(Against the Individual Defendants)

120. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

121. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Wynn Resorts.  The Individual Defendants were unjustly enriched as a result of the compensation and/or director remuneration they received while breaching fiduciary duties owed to Wynn Resorts.

122. Plaintiff, as shareholder and representative of Wynn Resorts, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

123. Defendants, and each of them, acted with fraud, oppression, and/or malice toward the Company, exhibited an intention and willingness to injure the Company and/or a conscious disregard for the rights and safety of the Company, and each Defendant, should be punished and made an example of by imposition of punitive or exemplary damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

124. As a result of the misconduct alleged herein, Defendants are liable to the Company, and their continuing violations of duty should be enjoined.

125. Plaintiff and the Company have no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.   Determining that this action is a proper derivative action maintainable under law and demand is excused;

B.   Awarding, against all Defendants and in favor of Wynn Resorts, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C.   Awarding to Wynn Resorts restitution from Defendants and ordering disgorgement of all profits, benefits, and other compensation obtained by the Defendants;

D.      Directing Wynn Resorts to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its shareholders from a recurrence of the damaging events described herein;

E.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and,

F.      Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury to Rule 38(b) of the Federal Rules of Civil Procedure.

DATED this 15th day of February, 2018.

**HOLLEY DRIGGS WALCH**
**FINE WRAY PUZEY & THOMPSON**

*/s/Kimberly P. Stein*
BRIAN W. BOSCHEE, ESQ. (NBN 7612)
KIMBERLY P. STEIN, ESQ. (NBN 8675)

HARWOOD FEFFER LLP
Robert I. Harwood
Daniella Quitt
SARRAF GENTILE LLP
Ronen Sarraf
Joseph Gentile

*Attorneys for Plaintiff Rickey A. Broussard*

## **VERIFICATION**

I, Rickey A. Broussard, declare that I have reviewed the Verified Derivative Complaint ("Complaint") prepared on behalf of Wynn Resorts Limited and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason I believe them to be true. I further declare that I am a current holder and have been a holder of Wynn Resorts Limited common stock at all relevant times.

2/15/18
_____
Date

_____
Rickey A. Broussard